# UNITED STATES *v.* POWERS ET AL.

No. 102.   Argued November 18, 1938.—Decided January 9, 1939.

*Mr. Charles W. Leaphart,* with whom *Solicitor General Jackson* and *Assistant Attorney General McFarland* were on the brief, for the United States.

*Mr. T. H. Burke* for respondents.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

By this proceeding (begun in 1934) the United States seek to prevent further taking of water from certain non-navigable streams within the Crow Indian Reservation. This water is essential to the cultivation of respondents' lands allotted more than twenty years ago to members of the tribe and presently held under properly acquired fee simple titles. The prayer of the bill is for a permanent injunction against "maintaining or using said dams and ditches, as aforesaid, and from diverting by means of said dams and ditches or in any other manner any of the waters from Lodge Grass Creek or Little Big Horn River and their tributaries; . . ."

The decree of the Circuit Court of Appeals dismissing the bill must be affirmed.

By Treaty of May 7, 1868, 15 Stat. 649, 650–651, the United States set aside a large tract of arid land now within the State of Montana as a Reservation for the "absolute and undisturbed use and occupation" of Crow Indians, and they undertook to make their permanent homes thereon. It provides that whenever an individual Indian desires "to commence farming" he may select land, under stated conditions, which thereupon shall "cease to be held in common, but the same may be occupied and held in the exclusive possession of the person selecting it, and of his family, so long as he or they may continue to cultivate it." Also—

"The President may at any time order a survey of the reservation, and, when so surveyed, Congress shall pro-

vide for protecting the rights of settlers in their improvements, and may fix the character of the title held by each. . . . When the head of a family or lodge shall have selected lands and received his certificate as above directed, and the agent shall be satisfied that he intends in good faith to commence cultivating the soil for a living, he shall be entitled to receive seeds and agricultural implements for the first year in value one hundred dollars, and for each succeeding year he shall continue to farm, for a period of three years more, he shall be entitled to receive seeds and implements as aforesaid in value twenty-five dollars per annum."

The Treaty contains no definite provision concerning apportionment or use of waters. Although the lands are arid a considerable area is susceptible of cultivation under irrigation.

The Act of Congress approved April 11, 1882, ch. 74, 22 Stat. 42, 43, refers to "an agreement for the sale to the United States [by the Crows] of a portion of their said reservation, and for their settlement upon lands in severalty," etc. In return the United States agreed to survey the remaining lands and divide them among members of the tribe; also " 'to issue patents to us respectively, therefor, so soon as the necessary laws are passed by Congress.' " Section 2—

"That the Secretary of the Interior be, and he is hereby, authorized to cause to be surveyed a sufficient quantity of land on the Crow Reservation to secure the settlement in severalty of said Indians as provided in said agreement, and upon the completion of said survey he shall cause allotments of land to be made to each and all of the Indians of said Crow tribe in quantity and character as mentioned and set forth in the agreement above named, and upon the approval of said allotments by the Secretary of the Interior he shall cause patents to issue to each and every allottee for the lands so allotted, with the same

considerations, restrictions, and limitations mentioned therein as are provided in said agreement."

The Act of February 8, 1887, ch. 119, 24 Stat. 388, 389–390, provides for allotments in severalty to Indians upon any reservation created for their use whenever in the President's opinion any part is advantageous for agricultural and grazing purposes. And it directs that after allotments are approved the Secretary of the Interior shall issue patents declaring the United States will hold the land for twenty-five years in trust and thereafter "will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever . . ." Section 7—

"That in cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior be, and he is hereby, authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations; and no other appropriation or grant of water by any riparian proprietor shall be authorized or permitted to the damage of any other riparian proprietor."

The Act of March 3, 1891, ch. 543, 26 Stat. 989, 1040, mentions another conveyance by the Crows to the United States and appropriates $200,000 to be expended under direction of the Secretary of the Interior for irrigation in the valleys of the Big Horn and Little Big Horn Rivers and on Pryor Creek, within the diminished Reservation.

The Act of May 8, 1906, ch. 2348, 34 Stat. 182, 183, authorizes the Secretary of the Interior to issue to Indian allottees patents in fee simple "and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed . . ." Also—

"Hereafter when an allotment of land is made to any Indian, and any such Indian dies before the expiration of the trust period, said allotment shall be cancelled and

the land shall revert to the United States, and the Secretary of the Interior shall ascertain the legal heirs of such Indian, and shall cause to be issued to said heirs and in their names, a patent in fee simple for said land, or he may cause the land to be sold as provided by law and issue a patent therefor to the purchaser or purchasers, and pay the net proceeds to the heirs, or their legal representatives, of such deceased Indian. The action of the Secretary of the Interior in determining the legal heirs of any deceased Indian, as provided herein, shall in all respects be conclusive and final."

Commencing in 1901 allotments in severalty of tracts abutting or adjacent to the Little Big Horn River or Lodge Grass Creek were made to respondents' Indian predecessors. These culminated in the issuance of fee simple patents as provided by Act of May 8, 1906.[1] Each patent undertook to convey the land "together with all the rights, privileges, immunities and appurtenances, of whatsoever nature, thereunto belonging," but contained no express provision concerning water rights. Respondents have succeeded to the interest of the original allottees either by mesne conveyances or by purchase at government sales of deceased allottees' lands.

The Little Big Horn River and its affluent, Lodge Grass Creek, under normal conditions may afford sufficient water to irrigate twenty thousand acres within the Reservation. Through private ditches respondents and their predecessors have long conveyed water from these streams in order to irrigate their lands and thus render them susceptible of cultivation. It is not suggested that water therefor can be obtained from any other source.

Petitioners maintain—

That prior to 1885, the United States commenced construction of irrigation works intended to divert

---

[1] Ch. 2348, 34 Stat. 182.

waters from the streams in question. These gradually developed into a system normally capable of carrying sufficient water to irrigate 20,000 acres.[2] None of respondents' lands lie within the ambit of these projects; and neither the original allotments nor the patents specifically granted the use of any water.

That Congress gave the Secretary of the Interior control of Reservation waters. Irrigation projects initiated under his authority prior to allotments of respondents' lands sufficed to dedicate and reserve sufficient water for full utilization of these projects; rights acquired by the allottees were taken subject to this reservation.

That because of drought during 1931 to 1934, and respondents' diversion of waters upstream from the projects so initiated, the available water became insufficient properly to irrigate some 8,000 acres lying therein and under cultivation. Accordingly the injunction should be granted; all waters from the two streams had been devoted to those and similarly situated lands so far as necessary for farming operations.

Respondents maintain that under the Treaty of 1868 waters within the Reservation were reserved for the equal benefit of tribal members (*Winters* v. *United States,* 207 U. S. 564) and that when allotments of land were duly made for exclusive use and thereafter conveyed in fee, the right to use some portion of tribal waters essential for cultivation passed to the owners.

The respondents' claim to the extent stated is well founded.

---

[2] See Act of March 1, 1899, ch. 324, 30 Stat. 924; Act of May 31, 1900, ch. 598, 31 Stat. 221; Act of April 27, 1904, ch. 1624, 33 Stat. 352.

Manifestly the Treaty of 1868 contemplated ultimate settlement by individual Indians upon designated tracts where they could make homes with exclusive right of cultivation for their support and with expectation of ultimate complete ownership. Without water productive cultivation has always been impossible.

We can find nothing in the statutes after 1868 adequate to show Congressional intent to permit allottees to be denied participation in the use of waters essential to farming and home making. If possible, legislation subsequent to the Treaty must be interpreted in harmony with its plain purposes.

The Secretary of the Interior had authority (Act 1887) to prescribe rules and regulations deemed necessary to secure just and equal distribution of waters. It does not appear that he ever undertook so to do. Certainly he could not affirmatively authorize unjust and unequal distribution. The statute itself clearly indicates Congressional recognition of equal rights among resident Indians.

Adoption by the Secretary of plans for irrigation projects to serve certain lands was not enough to indicate a purpose to exclude all other land from participation in essential water and thereby destroy the equal interest guaranteed by the Treaty. Subsequent allotments for farming followed by patents negative any such notion. The patented lands had no value for agriculture without water; they were selected for homes and individual farming.

The petitioners have shown no right to the injunction asked. We do not consider the extent or precise nature of respondents' rights in the waters. The present proceeding is not properly framed to that end.

The challenged decree must be

*Affirmed.*

Mr. Justice Reed took no part in the consideration or decision of this case.