UNITED STATES, Plaintiff,

and

Klamath Indian Tribe, Plaintiff-Intervenor,

v.

Ben ADAIR et al., Defendants,

and

The State of Oregon, Defendant-Intervenor.

Civ. No. 75–914.

United States District Court, D. Oregon.

Sept. 27, 1979.

**338**

Sidney I. Lezak, U. S. Atty., Thomas C. Lee, Asst. U. S. Atty., Jean Lowman, Sp. Asst. U. S. Atty., Portland, Or., Donald W. Redd, Atty., Dept. of Justice, Washington, D.C., for plaintiff.

Timothy LaFrance, Richard B. Collins, Daniel H. Israel, Raymond Cross, Native American Rights Fund, Boulder, Colo., for plaintiff-intervenor Klamath Indian Tribe.

Hugh L. Biggs, Jere M. Webb, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., Theodore R. Conn, Conn & Lynch, Lakeview, Or., for defendants.

James A. Redden, Atty. Gen., James W. Durham, Jr., Deputy Atty. Gen., Timothy D. Norwood, Tort Litigation Supervisor, Salem, Or., for defendant State of Or.

## OPINION

SOLOMON, District Judge:

In 1864, by treaty with the Klamath and Modoc Indians (Indians), the United States created the Klamath Indian Reservation (Reservation) in south central Oregon, where the Indians had lived and maintained a hunting, fishing, and gathering economy for more than a thousand years. From time to time, the Federal Government (Government) allotted parcels of Reservation land to individual Indians. Some allottees sold or leased their land to private persons, both Indian and non-Indian.

After 1864, the Government and the Indians began irrigating the Reservation to develop agriculture.

On August 13, 1954, Congress enacted the Klamath Termination Act, 68 Stat. 718, which terminated the Reservation. By 1973, all land which the Indians had held in common was either sold to private persons or acquired by the Government for national forest or wildlife refuge purposes.

This case concerns conflicting claims to water rights. The Government and two of its agencies (the Fish and Wildlife Service and the Forest Service) brought this action to determine the rights of parties with interests in the former Reservation lands to use the waters of the Williamson River system (River).

The Klamath Indians have lived for more than a thousand years in an area of south central Oregon east of the Cascade Mountains which includes the Klamath Marsh (Marsh). The largest settlement of Klamath Indians was located along the Williamson River in the vicinity of the Marsh.

Historically, the Klamath Indians depended on the Marsh and its surrounding rivers, lakes, and forests for food. There they fished, hunted waterfowl and game, and gathered edible plants. The Indians also depended on the area for clothing and building materials.

Even now, hunting, fishing, and gathering in the area are important to the Klamath Indians.

On October 14, 1864, the Klamath Indians entered into a treaty with the United States. Under the Treaty, the Indians ceded their interest in more than 12 million acres of land to the United States. In return, the Government reserved 768,000 acres from the public domain and created the Reservation for exclusive occupation by the Indians.

Article I of the Treaty reserved to the Indians "the exclusive right of taking fish in the streams and lakes [of the Reservation], and gathering edible roots, seeds, and berries within its limits."

Under Article II, the government agreed to pay $80,000 during a period of 15 years to "promote the well-being of the Indians, advance them in civilization, and especially agriculture, and . . . secure their moral improvement and education."

The Government also agreed to make additional payments for personnel and materials needed to farm the Reservation lands.

The Treaty protected the Indians' right to pursue their traditional culture and means of livelihood while encouraging them to develop agriculture.

After October 14, 1864, the Government held legal title to the Reservation lands for the benefit of the Indians. From time to time, the Secretary of the Interior allotted parts of the Reservation to individual Indians. Many of the allotments were later sold or leased as pasture, often to non-Indians.

After 1864, the Bureau of Indian Affairs and the United States Irrigation Service,

along with individual Indians, began to develop irrigation systems on Reservation land to promote livestock grazing.

In 1918, the Government claimed an undetermined amount of water from the Williamson River system to irrigate approximately 73,000 acres in the Klamath Marsh area.

By 1953, more than a third of the 668 Klamath Indian families living on the Reservation supported themselves by agriculture.

In 1954, Congress terminated the Reservation. The Government agreed to purchase the interests in the Reservation lands of any Indian who chose to withdraw from enrollment in the Klamath Tribe. 78% (1,659 out of 2,113) withdrew. To pay them, the Government sold a large part of the Reservation lands. Title to the rest of the Reservation was transferred to the United States National Bank of Oregon (Bank), a private trustee, to hold and manage for the 474 Indians who chose to stay enrolled in the Tribe.

In 1961, the Government ended its supervision over the Tribe. Thereafter, with only a few exceptions, state and federal law applied to the Tribe and its members in the same way as to other citizens of Oregon.

In 1973, the Government acquired by condemnation most of the tribal land then held by the United States National Bank of Oregon. The rest of the trust land was sold to private persons. The trust is now in liquidation.

The Klamath Tribe no longer owns any land within the area involved in this action.

*Forest Lands.*

Beginning in 1893, the Government withdrew from the public domain parcels of land adjacent to the Reservation and within the watershed of the Williamson River. The Government reserved these lands as national forest. The waters of the Williamson River system are needed to maintain and preserve the forest.

In August 1958, to extend the Winema National Forest, the Government purchased the Indian interest in part of the forest lands on the Reservation itself. In 1973, the Government acquired by condemnation other forest lands on the Reservation which it added to the Winema National Forest.

*Wildlife Refuge.*

In 1960, the Government purchased the Indian interest in approximately 15,000 acres of the Klamath Marsh. The Government reserved this land from the public domain and created the Klamath National Wildlife Refuge (Refuge). The rest of the Marsh is now in private ownership.

The Fish and Wildlife Service has a duty to maintain and develop the Refuge as an inviolate migratory-bird sanctuary.[1]

The Fish and Wildlife Service wants to maintain the Refuge in its historic natural state, as wetlands to provide optimal conditions for wildlife and, in particular, for migratory birds.

*Agricultural Lands.*

The private parties to this action use most of this land for agriculture, and especially for cattle grazing. All of this land was originally part of the Reservation, and all private owners, both Indian and non-Indian, derive their title from conveyances by the Tribe or by individual Indian allottees.

*Present state of the Marsh.*

Much less water now reaches the Marsh than it did 75 years ago. Large areas of the Marsh have dried up. The number of migratory birds which use the Marsh has declined.

As the Marsh dries up, vegetation harmful to the growth of wildlife spreads. This leads to the further decline in the Marsh's capacity to support wildlife. Only about 10% of the Refuge is now open water. 75 years ago the proportion was 50%. A 50/50 balance is necessary to encourage the growth of animals and desirable vegetation. Unless the process is reversed, the Refuge will become meadowland unsuitable for waterfowl nesting, and will no longer serve its intended purpose as a wildlife refuge.

1. Act of August 23, 1958, 72 Stat. 816; § 4, Act of March 16, 1934, 48 Stat. 451.

*The Government Contends:*

1. When the Reservation was created, the Indians reserved their rights to use as much water as they needed to fulfill the purposes of the Reservation. *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

Here, the Government asserts that one of the purposes of the Klamath Reservation was to protect the Indians' traditional use of the Marsh and the forests in the Reservation. The Government asserts that this purpose cannot be fulfilled unless enough water flows through the Marsh to maintain it as wetlands, and flows through the forests to provide the Indians' traditional resources on a sustained-yield basis. The Government asks for a declaration that since 1864 no one has been entitled to divert or appropriate water from the River, if the diversion or appropriation would threaten the Marsh and forests.

2. When the Government purchased parts of the Marsh and Reservation forest lands in 1960 to create the Refuge and to extend the Winema National Forest, it acquired the Indians' rights to use as much water as necessary to maintain the Marsh as a natural wetlands, and to ensure that the forest could be used on a sustained-yield basis.

From 1864 to 1960, the Government held legal title to the Reservation for the benefit of the Indians. In 1960, in connection with the termination of the Tribe, the Government bought the Indians' beneficial interests in approximately 15,000 acres of the Marsh to create a migratory bird refuge.[2] The Government also bought the Indians' beneficial interest in most of the Reservation forest lands to extend the Winema National Forest.

In support of its second contention, the Government relies on the rule that when land is sold, appurtenant water rights pass with the land, unless a contrary intent is

shown. The Government asserts that, in enacting the 1958 Act, Congress intended it to acquire the Refuge lands and the Indians' right to enough water from the River to keep the land in a natural wetlands state, and to ensure that the forest resources used by the Indians could continue to be used on a sustained-yield basis. The Government also claims it has the same water rights as the Indians because it uses the Marsh and forest lands in the same way that the Indians did before 1960.

3. When the Government acquired another part of the Klamath Indian forest lands in 1973 to extend the Winema National Forest, it obtained the Indians' appurtenant water rights.

When the Reservation was terminated in 1954, the Government transferred legal title to these forest lands to the Bank, as a private trustee. The Bank managed the forest for the Indians who elected to remain in the Tribe. The Government asserts that the parties to the conveyance intended appurtenant water rights to pass with the land and to be held for the benefit of the Indians. The Government contends that when Congress authorized condemnation of the land in 1973 to add to the Winema National Forest,[3] Congress intended the Government to acquire any appurtenant water rights needed to maintain the land as a national forest.

The Government also contends that it enjoys the same rights to the water for this land as the Indians enjoyed, because the Government administers the forest in the same way as the Bank administered it for the Indians before 1973.

4. When the Government withdrew forest land adjacent to, but not a part of the Reservation in 1893, 1906, 1907, and 1930 for use as national forest, it reserved rights to use as much unappropriated water as necessary to fulfill the purposes of the national forest.

To support this contention, the Government asserts that when the United States

---

**2.** Act of August 23, 1958, 72 Stat. 816, as amended, 73 Stat. 477, 25 U.S.C. § 564w.

**3.** Act of August 16, 1973, 87 Stat. 349, 25 U.S.C. § 564w–2.

withdraws land from the public domain for a particular purpose, it generally reserves a right to use water necessary to fulfill the purpose of withdrawing the land. The Government relies on *Arizona v. California, supra*, and *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), for its assertion that the priority date of this water right is the date the land was withdrawn.

5. The Government holds water rights in the Refuge and Winema National Forest necessary to protect the Indians' hunting and fishing rights.

By the Klamath Termination Act of 1954, Congress reserved the Indians' Treaty hunting, fishing and gathering rights and intended to maintain and protect fish and wildlife habitats on the land, because hunting and fishing rights are worthless without sufficient game, fish, and edible plants on the land. The prohibition of hunting within the Refuge is irrelevant, because proper maintenance of the Refuge ensures that sufficient wildlife will be available outside the Refuge where Indians may hunt.

6. The Government makes the following additional contentions on the water rights of private persons who acquired Reservation land:

First, individual Indian allottees or Indian purchasers acquired the appurtenant water rights which the Treaty reserved to the Indians in 1864. *United States v. Powers*, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939); *Arizona v. California, supra*.

Second, non-Indian purchasers of Indian land also obtained reserved water rights with an 1864 priority date, but their rights are subject to loss by non-use or abandonment. Non-Indian purchasers are entitled to only as much water (1) as their Indian predecessors actually used for irrigation and domestic purposes when the land was conveyed, *and* (2) as the non-Indian purchaser "might with reasonable diligence place under irrigation." *United States v. Hibner*, 27 F.2d 909 (D.C.Idaho 1928). After the "reasonable diligence" period, the non-Indian purchasers are subject to the doctrine of prior appropriation.

Under the Government's argument, if an Indian allottee never diverted water for farming or domestic use, the water rights of his non-Indian successor would depend wholly on the doctrine of prior appropriation.

7. The Government asks the District Court to retain jurisdiction after it enters a declaratory decree so that State action to implement the decree may be reviewed.

The Pre-Trial Order provides that the declaration will not bind "state officials as to decisions made in their official capacity affecting the rights or interests of non-parties to this litigation." The Government fears that state officials may take action which is inconsistent with the Court's declaration and adverse to the Government's declared rights. The Government therefore asks this court to retain jurisdiction.

8. Finally, the Government denies the defendant's contention that the Klamath River Compact is relevant to this action. The Compact is the agreement between Oregon and California for the division of Klamath River water between those states.

The United States is not a party to the Compact. The Government submits (a) that it cannot be bound by the Compact, but (b) that even if bound, the Compact is irrelevant here because this action involves a small amount of Klamath River water, and the exercise of the Government's rights would have no effect on the flow of water downstream to California. The Pre-Trial Order provides that this action will not decide the rights of any downstream user, state agencies included.

*The Klamath Tribe contends:*

1. It is entitled to enough River water to preserve the Marsh as a suitable wetlands habitat for fish and wildlife.

Under the Treaty, the Tribe reserved the exclusive right to hunt and fish on the Reservation. By reason of this reservation, the Tribe asserts that it reserved to itself as much water as it needed to fulfill the purposes of the Reservation, including the preservation of hunting and fishing rights.

*Winters v. United States, supra; United States v. Walker River Irrigation District,* 104 F.2d 334 (9th Cir. 1939); *United States v. Ahtanum Irrigation District,* 236 F.2d 321 (9th Cir. 1956). Under *Winters,* Indian water rights prevail over any conflicting claims by other parties, including the United States and the State of Oregon, and the determination of Indian water rights is not subject to a balancing of interests.

2. The priority date of the Indians' hunting and fishing rights, and of the water rights needed to preserve hunting and fishing, is time immemorial.[4]

Indians have fished and hunted on the Reservation lands since time immemorial, and under the Oregon Territorial Act of 1848, 9 Stat. 323, the Government recognized the Indians' right to occupy and use these lands.

The 1864 Treaty confirmed their pre-existing rights to hunt and fish. In *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), the Court stated that the treaty right of taking fish was not a grant of right to the Indians but a reservation of rights already possessed and not granted away by them.

3. A non-Indian purchaser of Indian land is entitled to use a share of Tribal water only to the extent that his Indian predecessor actually used the water.

In making this contention, the Tribe concedes that *United States v. Ahtanum Irrigation District, supra,* is against them, but the Tribe argues that the 9th Circuit Court "adopted this position without the benefit of argument on the issue by the parties."

4. The Klamath Termination Act of 1954, which expressly preserved the Tribe's Treaty hunting and fishing rights, gave the Tribe implied rights to have enough water flow through the Reservation lands to preserve them as suitable habitat for fish and wildlife.

*The State of Oregon contends:*

1. No water rights attach to Indian hunting and fishing rights.

Like the individual landowner defendants, Oregon asserts that water rights are appurtenant to land, that a person cannot have water rights without a possessory interest in land, and that the Klamath Tribe does not have water rights because it no longer owns any land.

2. This court should not declare Indian water rights; it should let the Indians pursue ordinary tort remedies if any party interferes with their hunting and fishing rights by appropriating water.

3. The Tribe lacks standing to assert the hunting and fishing rights of its members.

4. The doctrine that when the Government withdraws land from the public domain for a particular purpose, it impliedly reserves water needed to fulfill that purpose, as enunciated in *Winters v. United States, supra,* applies only to land reserved from the public domain, and not to land acquired by purchase or condemnation.

Specifically, Oregon asserts that the Government cannot claim *Winters* doctrine water rights either for the Refuge or for the forest lands which were once part of the Reservation, because the Government acquired those lands by purchase or condemnation.

5. Oregon is entitled to Indian water rights appurtenant to Reservation land which Oregon acquired from Indian allottees, subject only to loss of those rights by abandonment. Oregon claims an 1864 priority date for these rights.

6. Oregon owns 92,000 acres of former Reservation land along with all appurtenant water rights, except those which it may have abandoned to the public.

*The individual landowners contend:*

They are entitled to the water rights which were reserved to the Indians by the Treaty with a priority date of 1864. *United States v. Powers, supra; Arizona v. California, supra; United States v. Ahtanum Irrig.*

---

4. This contention is limited to hunting and fishing rights. The Tribe does not assert that Indian irrigation rights date from time immemorial.

*Distr., supra; United States v. Hibner, supra.*

*The individual landowners, in reply to the Government's claims and contentions, assert :*

1. The Government is not entitled to an 1864 priority date for its water rights on the Refuge because the Government did not acquire beneficial title to the Refuge lands until 1960.

2. The *Winters* doctrine is not applicable to all Government land in this action, regardless of how acquired. The *Winters* doctrine applies only to land reserved from the public domain and which was never in private or State ownership. When the Government acquires land by purchase or condemnation, it gets only those water rights which are appurtenant to and pass with the conveyance of the land. Additional water rights can be acquired only in accordance with State law.

3. The Government when it set lands aside as a national forest outside the Reservation did not reserve water for fish conservation and recreational purposes; the Government's water rights on these lands are strictly limited under *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978).

4. The Klamath River Compact binds the United States and governs future acquisition of water rights by all parties to this action.

5. This court should not retain jurisdiction after it enters a declaratory judgment; the State court is the proper forum for the handling of all subsequent matters.

*In reply to the Klamath Tribe's claims and contentions, the individual landowners assert :*

1. The Tribe has no water rights, because it does not own any land within the relevant area.

Water rights are always appurtenant to land.

When the Tribe disposed of its land, the Tribe and its members lost their water rights, even though, under *Kimball v. Callahan*, 590 F.2d 768 (9th Cir. 1979), they retained their hunting and fishing rights.

2. The right to hunt and fish on public land does not entitle the Indians to require other parties to preserve public land as a suitable habitat for fish and wildlife. Congress never intended to impress the former Reservation lands with a "wilderness servitude."

3. *Kimball v. Callahan* was wrongly decided. The Tribe has no hunting and fishing rights and lacks standing to assert those rights on behalf of its members.

*Issues.*

1. Should this court exercise jurisdiction to declare the water rights of the parties?

2. What rights are the Indians entitled to on the former Reservation:
   (a) hunting and fishing rights;
   (b) water rights;
   (c) individual rights;
   (d) tribal rights;
   (e) does the Tribe have standing to assert rights on behalf of individual Indians?

3. What are the water rights of the Government for:
   (a) the wildlife refuge;
   (b) the forest lands within the former Reservation;
   (c) the forest lands outside the former Reservation?

4. What water rights are non-Indian landowner defendants entitled to?

5. What water rights is the State of Oregon entitled to?

6. What are the priority dates of these rights?

7. What is the effect of the Klamath River Basin Compact on this action?

8. Should the court retain jurisdiction if it enters a declaratory judgment?

*Jurisdiction.*

■ Oregon asserts that this court should not declare Indian water rights because the court will be prevented from balancing equities. *Cappaert v. United States*, 426 U.S. 128, 139, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). The remedy for the claims of the

Indians that their hunting and fishing rights are interfered with is in tort where the competing equities of the parties may be balanced.

Tort remedies are not appropriate here. Hunting and fishing are an integral part of the Indians' traditional way of life. Damages would be difficult to assess and would be inadequate to compensate the Indians for the loss of their hunting and fishing rights. Before a court could grant tort relief, it would have to determine the rights of the Indians under federal law. I believe it is appropriate to declare those rights now.

*The Indians' rights.*

(a) *Hunting and fishing.*

■ The Indians have hunted, fished, and gathered food on the Reservation lands since time immemorial.

Article I of the Treaty of 1864 secured for the Indians the exclusive right to fish and gather edible plants on the Reservation. That provision includes the right to hunt and trap. *Kimball v. Callahan*, 493 F.2d 564 (9th Cir.), *cert. den.*, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (*Kimball I*). This was not a grant of rights to the Indians, but a reservation of rights already possessed. *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

■ Treaty hunting and fishing rights for the Tribe, for all its members on the final tribal roll and for their descendants survived the termination of the Reservation. Klamath Termination Act, 25 U.S.C. §§ 564–564x; *Kimball v. Callahan*, 590 F.2d 768 (9th Cir. 1979), *petition for cert. filed*, —— U.S. ——, 99 S.Ct. 2834, 61 L.Ed.2d 282 (1979) (*Kimball II*).

(b) *Water rights.*

The principal purpose of the Treaty was to provide an area for the exclusive occupation of the Indians so that they could continue to be self-sufficient. The Treaty provided two ways for the Indians to be self-sufficient.

First, it ensured that the Indians could continue their traditional way of life which included hunting, fishing, trapping, and gathering. Article I of the Treaty secured to the Indians their right to pursue their traditional way of life.

Second, it encouraged the Indians to adopt agriculture. Articles II to V provide for Government assistance; nevertheless, most of the Indians chose to retain their traditional way of life.

In my view, the provisions of Article I, particularly the protection of Indian hunting and fishing rights, were more important to the Tribe in 1864 than were the provisions of Articles II to V.

■ The Treaty should be construed liberally in favor of the Indians. *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912); *United States v. Walker River Irrigation District*, 104 F.2d 334 (9th Cir. 1939). Ambiguities and uncertainties in the Treaty should be resolved from the standpoint of the Indians. *Winters v. United States, supra*, 207 U.S. at 576, 28 S.Ct. 207.

■ When, by treaty, the Government withdraws land from the public domain and reserves it for a federal purpose, the Government impliedly reserves appurtenant unappropriated water to the extent needed to fulfill the purposes of the reservation. *Cappaert v. United States, supra* ; *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *United States v. Powers*, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939); *Winters v. United States, supra*. Here, the Government reserved land from the public domain and created the Klamath Reservation to preserve Indian hunting and fishing rights and to encourage agriculture.

The Treaty granted the Indians an implied right to as much water on the Reservation as was necessary to fulfill these purposes. The termination of the Reservation did not abrogate the Indians' water rights. Klamath Termination Act, § 14, 25 U.S.C. § 564m. The Indians are still entitled to as much water on the Reservation lands as they need to protect their hunting and fishing rights. If the preservation of these rights requires that the Marsh be main-

tained as wetlands and that the forest be maintained on a sustained-yield basis, then the Indians are entitled to whatever water is necessary to achieve those results.[5]

(c) *Individual Indians.*

■ Individual Indians are entitled to the hunting and fishing rights secured by the Treaty, *Kimball I*, and this implies all of the water rights necessary to protect their hunting and fishing rights.

Some of the individual Indians in this action own land which was allotted or sold to them or to their ancestors. Many of these Indians are farmers; they need water to irrigate their land. In addition to water rights for the preservation of hunting and fishing rights, the Treaty also granted the Indians an implied right to use water necessary for agriculture.

When parts of the Reservation were allotted to individual Indians, they acquired the right to use a portion of the tribal waters essential for cultivation. *United States v. Powers, supra.* Indian allottees were not required to appropriate water within any specific period of time, but they could appropriate it as the need arose. Their Indian successors in interest acquired the allottees' water rights to the same extent as if the allottees still possessed the land. *United States v. Ahtanum Irrigation District, supra.*

The individual Indian landowners are entitled to use water essential to their agricultural needs when those needs arise. This right, however, is subject to the superior right of other Indians to use the water for the preservation of hunting and fishing on the Reservation lands.

(d) *The Tribe's rights.*

■ The Tribe, when it possessed land, possessed hunting and fishing rights and also water rights. Now the Tribe no longer possesses land within the former Reservation.

The defendants contend that water rights are always appurtenant to land; when the Tribe disposed of its land, the Tribe also relinquished all its water rights.

This contention overlooks the nature of the connection between Indian water rights and Indian hunting and fishing rights. The Indians obtained their reserved right to the water they need to cultivate their land from Article II of the Treaty. Their other rights to water come from the hunting and fishing rights reserved to them in Article I. Without sufficient water to preserve fish and wildlife on the Reservation lands, Indian hunting and fishing rights would be worthless.

The Court of Appeals in *Kimball v. Callahan, supra,* held that Indian hunting and fishing rights survived the termination of the Reservation.

Oregon contends that, under *Kimball v. Callahan,* hunting and fishing rights belong to individual Indians only and not to the Tribe. For this contention they rely on one sentence in a note:

"Treaty rights to hunt and fish are, however, rights of the individual Indians." 493 F.2d 564, 569 n.9.

This sentence is taken out of context. When considered with the text, it merely means that the individuals retained their hunting and fishing rights even after they withdrew from the Tribe.

The Court did not say that the Tribe had no hunting or fishing rights after the Reservation was terminated. In fact, in *Kimball II,* the Court said that

"*Kimball I* held that the Act did not abrogate tribal treaty rights of hunting, fishing, and trapping." 590 F.2d 768, 776.

The termination of the Reservation and the disposition of all Tribal land did not dispossess the Tribe of water rights essential to protect hunting and fishing rights.

---

5. I express no opinion on whether the Indians are entitled to require the Government to preserve their hunting and fishing rights. The Government's current uses of the Marsh and forests of the Reservation are consistent with the Indians' claims in this action; there is no need to decide that question now.

(e) *Can the Tribe assert the rights of its members?*

■ The defendants contend that the Tribe lacks standing to assert hunting and fishing rights on behalf of its members. There is no merit to this contention.

The Tribe has the same Treaty hunting and fishing rights and water rights as its members. Even if the Tribe had no hunting and fishing or water rights of its own, it would still have standing to assert those rights on behalf of its members. See *Moe v. Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Confederated Tribes of Colville v. State of Washington,* 446 F.Supp. 1339 (E.D.Wash.1978).[6] *The Government's water rights.*

(a) *Wildlife Refuge and Forest lands within the former Reservation.*

The Government contends that it acquired the Indians' water rights for the land by purchase in 1960 [7] and by condemnation in 1973.[8] Congress, in authorizing these acquisitions, intended the Government to acquire Indian rights to a streamflow which would be sufficient to keep the Refuge lands in their natural wetlands state and which would also ensure that the Indians' traditional forest resources could be used on a sustained-yield basis.

The Government also contends that it is entitled to the Indians' reserved water rights under the *Winters* doctrine because the Government uses the lands for the same purposes as the Indians used them when the Reservation existed. Defendants disagree. They assert that the *Winters* doctrine applies only to land reserved from the public domain, and does not apply to land acquired by purchase or condemnation.

It is unnecessary to decide these questions. The protection of the Indians' hunting and fishing rights requires a natural streamflow through both the Marsh and forest lands on the former Reservation.

The Indians' use of their rights to that streamflow will ensure that enough water flows through the Refuge and through the Winema National Forest within the former Reservation to fulfill the Government's purposes for those lands.

It is therefore unnecessary to issue a separate declaration of Government water rights for the Refuge and forests of the Reservation.

(b) *Forest lands outside the Reservation.*

■ The Government withdrew these lands from the public domain for use as a national forest. Under the *Winters* doctrine, the Government acquired reserved rights to use as much unappropriated water as necessary to fulfill the purposes of the national forest.

The defendants do not deny that the *Winters* doctrine applies to this part of the Winema National Forest. Nevertheless, they contend that even under *Winters* the Government may not appropriate water for fish conservation or recreational purposes. Defendants rely on *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). There, the Government in 1899 withdrew land from the public domain for the Gila National Forest. The state court held that the Government was entitled to water essential for the purposes for which the land was withdrawn, but those purposes did not include recreation, aesthetics, wildlife preservation, or cattle grazing. The United States Supreme Court affirmed. It held that, before 1960, Congress intended national forests to be reserved for only two purposes: "to conserve the water flows and to furnish a continuous supply of timber for the people."

In 1960, Congress enacted the Multiple-Use Sustained-Yield Act, 16 U.S.C. § 528 *et seq.,* which extended the purposes for which

---

**6.** The Tribe does not assert irrigation rights for individual landowners. They are parties to this action and assert their own claims as defendants. It is therefore unnecessary to decide whether the Tribe has standing to assert the irrigation rights of its members.

**7.** Act of August 23, 1958.

**8.** Act of August 16, 1973.

national forests are reserved. The purposes now include recreation, range, timber, watershed, and wildlife and fish conservation. But the Supreme Court held that the 1960 Act was not retroactive and did not apply to the Gila National Forest.

Here, the Government withdrew land for national forest in 1893, 1906, 1907, and 1930. I agree with the defendants that the 1960 Act does not apply. The Government is only entitled to water which was unappropriated when the forest lands were reserved and which is essential for timber production and conservation of water flow.

*The rights of non-Indian landowners on former Reservation lands.*

■■■ The non-Indian landowner defendants are successors in interest to Indian allottees or Indian purchasers of former Reservation land. They claim rights to water which the Treaty impliedly reserved to the Indians for domestic and agricultural purposes. All of the individual landowner defendants contend that rights under the *Winters* doctrine were appurtenant to Indian allotments and passed to the successors of Indian allottees, whether the successors were Indians or non-Indians. They rely on *United States v. Powers, supra; United States v. Ahtanum Irrig. Distr., supra; United States v. Preston,* 352 F.2d 352 (9th Cir. 1965); and *United States v. Hibner,* 27 F.2d 909 (D.C.Idaho 1928).

*Hibner* was the only case which considered the precise issue involved in this case; namely, what water rights an Indian allottee can convey to his non-Indian successors in interest.

In *Powers,* the Government, for the Crow Indians, sought to prevent non-Indian successors to Indian allottees from appropriating irrigation water. The Supreme Court held that the Crow Reservation treaty contemplated farming by individual Indians and the treaty impliedly reserved water for the equal benefit of tribal members. When the Reservation was divided into allotments, the allottees and their successors acquired the right to use a portion of the tribal waters for irrigation. The Court did not consider the extent or nature of the non-Indian defendants' right to use tribal waters for irrigation.

In *Ahtanum,* the issue was the validity of an agreement which allocated water on the Yakima Reservation between the tribe and non-Indian successors to Indian allottees. The Court held that the non-Indian successors had a right to share in the water the Government diverted to irrigate the Reservation "just as if their lands were still in the possession of the original allottees."

Under *Ahtanum,* the non-Indian successor of an Indian allottee acquires a proportionate share of the water which the Indians diverted for the allottee's land; but the Court did not decide whether the successor also acquires a share of the water reserved to the Indians, but which had not been diverted by the time the allottee conveyed his land to his non-Indian successor.

In *United States v. Preston,* the Court held that an Indian living on a tribal reservation owns a proportionate share of the tribal waters "the minute the reservation is created, and his rights become appurtenant to his land the minute he acquires his allotment." 352 F.2d at 358.

In *Hibner,* as in this case, the District Court was asked to determine "the priority and amount of water to which the Indian lands . . . and those parties who have succeeded to the Indian allotments" are entitled.

The court held that non-Indian successors to Indian allottees acquire "the same character of water right with equal priority as those of the Indians," except that: (1) Indian landowners retain their water rights regardless of whether they use them, but non-Indians either use their rights or lose them; and (2) Indians may appropriate their share of reserved tribal water at any time; non-Indians acquire a water right for the actual acreage under irrigation at the time title passed from the Indians, and for any additional acreage which the non-Indian may with reasonable diligence place under irrigation. Non-Indians enjoy the same priority dates as their Indian predecessors for all appropriated water.

*Colville Confederated Tribes v. Walton*, 460 F.Supp. 1320 (E.D.Wash.1978), involved a similar problem. The court was asked to determine water rights of non-Indian successors to Indian allottees. In a carefully reasoned opinion, Chief Judge Neil reached a different conclusion from *Hibner*. Under the *Winters* doctrine, water is impliedly reserved to ensure that land set aside as a permanent Indian homeland will have the water necessary for the purposes of the reservation. Judge Neil held that the rationale of the *Winters* doctrine no longer applies after the land passes to non-Indians.

I am impressed with Judge Neil's discussion of the General Allotment Act of 1887, 25 U.S.C. § 331 *et seq.*, which permits sales of allotments to non-Indians [9]. Nevertheless, I prefer *Hibner* for two reasons. First, *Hibner* would advance the General Allotment Act's purpose of permitting Indians to sell their land on equal terms with non-Indians. It may be difficult for an Indian to sell his land if the conveyance to a non-Indian carries with it a right to only the amount of water actually appropriated at the time of the conveyance. This is particularly true if the priority date is the actual date of appropriation, and the appropriation was recent.

Second, *Hibner* is more consistent than *Walton* with *Ahtanum* which held that non-Indian successors are entitled to a rateable share of Indian irrigation waters "to the same extent *as if their lands were still held by the original allottees.*" Under *Walton*, a non-Indian successor would have no right to a rateable share, but only to the amount actually used by his allottee-predecessor. Even that amount may be taken from him

by an Indian landowner, who would enjoy an earlier priority date for reserved water rights.

I hold that a non-Indian successor to an Indian allottee acquires an appurtenant right to water for the actual acreage under irrigation when he gets title from his Indian predecessor. The priority date of that right is 1864.

The non-Indian also acquires a right, with an 1864 priority date, to water for additional acreage which he, with reasonable diligence, may place under irrigation. Otherwise, if the priority date of this right and the date of actual appropriation were the same, the additional water might be taken from him at any time by an Indian with reserved water rights.

Once land passes out of Indian ownership, all subsequent conveyances are subject to the doctrine of prior appropriation.

*Rights of the State of Oregon.*

(a) Oregon has authority, under appropriate standards, to regulate for conservation purposes the Indians' hunting and fishing rights on the former Reservation. *Kimball II*, 590 F.2d at 778.

■ (b) Oregon's rights to water for land it acquired by succession to Indian allottees are the same as those of the individual non-Indian landowners in this action.

(c) Oregon claims title to approximately 92,000 acres on the former Reservation. It asserts that the Swamp Lands Act of 1850, 43 U.S.C. § 982 *et seq.*, as extended to Oregon by statute in 1860, 43 U.S.C. § 988, entitled it to claim swamplands within the State. In 1902, Oregon claimed 92,000

---

**9.** Judge Neil held that the General Allotment Act "necessarily implies that some water may be sold with the land; otherwise the right to sell the land would be relatively worthless. The Act was designed to put Indians on an equal footing with the white man by allowing individual Indians to own fee title to land . . . . In providing fee ownership, Congress certainly intended that the Indian could sell his land like any other owner. Providing for alienability of implied reserved water rights is not necessary to accomplish this purpose. The General Allotment Act requires only that the allottee be permitted to convey a water right with his fee

to the same extent as a non-Indian homesteader . . . .

"In keeping with the purpose of the General Allotment Act, the allottee, like the non-Indian homesteader, must be permitted to convey with his land the water right which he was using at the time of the conveyance, with a priority date of the first appropriation of those waters. The priority date must be the date of actual appropriation rather than that of the founding of the reservation, for no part of the Indian allottee's implied water rights may be conveyed to a non-Indian." 460 F.Supp. 1320 at 1328.

acres on the Reservation. The United States Department of the Interior rejected the claim. Oregon contends that the rejection was improper and that patents should have issued to the State.

Oregon also claims "inchoate title" to the land and the right to appropriate essential water, subject to prior appropriation by others. Oregon denies that the Government and the Indians were ever entitled to appropriate water for these 92,000 acres.

The Government asserts that, regardless of whether it was right to reject the 1902 claim, Oregon did not pursue the claim, and therefore never acquired valid title to the land. The Government also asserts that Oregon's claim of inchoate title has no merit.

The facts on Oregon's claim are insufficiently developed for this court to determine title to the 92,000 acres. If Oregon wants to pursue this claim, it should file a separate action.

*Priority dates of the parties' water rights.*

(a) *Indian hunting and fishing rights.*

■ By the Treaty of 1864, the Indians reserved hunting and fishing rights which they had exercised for more than a thousand years. The priority date of these rights, and of the Indians' water rights which are necessary to preserve their hunting and fishing rights, is time immemorial.

(b) *Indian irrigation rights.*

■ These rights were granted to the Tribe and its members by the Treaty. The priority date of Indian rights to water for irrigation and domestic purposes is 1864.

(c) *The Government's water rights for the Winema National Forest outside the Reservation.*

■ The Government withdrew these parcels of land for use as national forest in 1893, 1906, 1907, and 1930. The date on which the Government withdrew each parcel is the priority date of the Government's water rights for that land.

(d) *The rights of the non-Indian landowners and the State of Oregon to water for irrigation and domestic purposes.*

For irrigation and domestic purposes, the non-Indian landowners and the State of Oregon are entitled to an 1864 priority date for water rights appurtenant to their land which formerly belonged to the Indians.
*The Klamath River Basin Compact.*

The individual defendants contend that the Government is not entitled to *Winters* doctrine rights for the Refuge and national forest within the Reservation. They assert that when the Government acquired those lands by purchase and condemnation, it acquired only the appurtenant water rights which accompanied conveyance of the land; acquisition of additional water rights after 1957 is governed by the Klamath River Basin Compact, 71 Stat. 497.

I find that it is unnecessary in this action to determine the Government's water rights for the Refuge and national forest within the Reservation. I therefore hold that there is no need to determine the Compact's relevance to acquisition of water rights by the Government after 1957.
*Retention of jurisdiction.*

■ In my view it may be necessary for this court to supervise the distribution of water consistent with this opinion and to pass on the many problems which may arise out of the allocation of water. It is therefore appropriate for this court to retain jurisdiction for a period of five years from the date of judgment or, if appealed, from the date of the final judgment on appeal.

This opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

Counsel for the individual defendants shall submit a proposed form of judgment.