UNITED STATES, Plaintiff,

and

Klamath Indian Tribes, Plaintiff–Intervenor,

v.

Ben ADAIR, et al., Defendants,

and

State of Oregon, Defendant–Intervenor.

No. CV 75–914–PA.

United States District Court,
D. Oregon.

Feb. 27, 2002.

As Amended April 9, 2002.

Michael W. Mosman, United States Attorney, James J. Sutherland, Assistant U.S. Attorney, District of Oregon, Eugene, OR, David W. Harder, United States Department of Justice, Denver, CO, for Plaintiff United States.

Carl V. Ullman, Attorney at Law, The Klamath Tribes Water Adjudication Project, Chiloquin, OR, Walter R. Echo-Hawk, K. Jerome Gottschalk, Native American Rights Fund, Boulder, CO, for Plaintiff-Intervenor Klamath Tribes.

Carol Dehaven Skerjanec, Attorney at Law, Vale, OR, for Defendants Kenneth J. Hufford, Leslie Hufford, Peggy Marenco, Hart Estate Investment Company, Boyd P. Braren, Boyd P. Braren Trust, John P. Mosby and Marilyn M. Mosby.

Hardy Myers, Attorney General, David E. Leith, Assistant Attorney General, Salem, OR, for Defendant-Intervenor.

### AMENDED OPINION & ORDER

PANNER, District Judge.

## I.  BACKGROUND

In this action, the Court declared the existence, nature, scope and priority of the reserved Indian water rights of the Klamath Tribes, but left the quantification of those rights to the State of Oregon's Klamath Basin Adjudication ("KBA"). *See, United States v. Adair,* 478 F.Supp. 336 (D.Or.1979) (*"Adair I"*).  The Court entered a Declaratory Judgment on April 21, 1980, which was affirmed in *United States v. Adair,* 723 F.2d 1394 (9th Cir.1983) (*"Adair II"*), cert. denied sub nom, *Oregon v. United States,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).  This Court retained continuing jurisdiction of this matter "for the purpose of enabling the parties or their successors in interest to apply to this court at any time for such orders and directions as may be necessary or appropriate for the construction and effectuation of this judgment, for the modification of any of the provisions hereof, and for the enforcement of compliance with this judgment."  Declaratory Judgment, ¶ 15.

Pursuant to Paragraph 15 of the Declaratory Judgment, Plaintiffs filed motions

for exercise of this Court's continuing jurisdiction. A dispute has arisen among the parties in the KBA over the proper interpretation of the Declaratory Judgment and how to effectuate rulings in this case to quantify the Tribes' water rights in the state proceeding. The motions were granted, and this Court is exercising its continuing jurisdiction to determine two narrow issues: (1) whether the Klamath Tribes have a water right to support reserved gathering rights; and (2) whether and to what extent the "moderate living" standard applies in quantifying the Tribes' water rights.[1]

## II. DISCUSSION

### A. The Gathering Right

■■■ The Klamath Tribes have reserved gathering rights, along with supporting water rights. The 1980 Declaratory Judgment explicitly holds that the tribal water right included water for, gathering purposes. Paragraph 3 of the Declaratory Judgment provides: "In creating the Reservation by treaty in 1864 the Government reserved land from the public domain to preserve the Tribe's hunting, fishing, trapping and gathering rights and to encourage agriculture. The treaty granted the Tribe an implied right to as much water on the Reservation as was necessary to fulfill these purposes." Paragraph 11 of the Declaratory Judgment provides: "The priority date of the Tribe's hunting, fishing, trapping and gathering rights, and their water rights necessary to preserve these hunting, fishing, trapping and gathering rights is time immemorial." The Court could not have been more clear in articulating its holding that gathering rights, and supporting water rights, are reserved to the Tribe. Moreover, the plain language of the 1864 Treaty, and a common-sense reading of *Adair I & Adair II*, and *United States v. OWRD*, 774 F.Supp. 1568 (D.Or.1991), aff'd. and modified, 44 F.3d 758 (9th Cir.1994), support this position. The Ninth Circuit's use of "hunting and fishing" language as a shorthand phrase shall not be construed to eliminate the Tribes' right to water for gathering purposes. There is nothing in *Adair I* or *Adair II* that is inconsistent with the Declaratory Judgment on this issue. Accordingly, the Klamath Tribes' water rights include a right to water to support resources the Tribes gather, in addition to the resources they hunt, fish, and trap.

### B. Legal Standard for Measuring Water Rights

The parties dispute how to apply the legal standard for quantifying the Tribes' water rights. The Oregon Department of Justice ("ODOJ") attempted to provide legal advice to the Adjudicator in the KBA on this issue, but admitted it was uncertain how to apply the relevant standards. The parties dispute not only what standard should be applied, but how it should be applied, and which party has the burden of proof. The primary dispute revolves around applying the "moderate living" doctrine announced in *Adair II*. The parties also struggle to interpret the phrase "as currently exercised" from *Adair II*.

■■■ At the outset, it is worth noting that any argument that would have the practical effect of quantifying the Tribes' reserved water right at a level that would not support productive habitat is rejected. That would result in abrogating the Tribes' treaty rights to hunt, fish, gather, and trap on the reservation lands. The Ninth Circuit has recently confirmed, in the context of the Klamath Tribes' water rights, that

---

1. The State of Oregon resisted the motion for excercise of the Court's jurisdiction on the ground that deference to the state adjudication was appropriate under the *Colorado River* doctrine. The court rejected that argument. *Opinion and Order, August 9, 2001,* dkt. no. 2359. Thereafter, the State of Oregon did not participate in the current proceeding, and took no position with regard to the merits of the substantive issues addressed in this opinion.

"[o]nly Congress can abrogate Indian treaty rights, *see United States v. Dion*, 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), and it has not done so here." *Klamath Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir.1999), *cert. denied*, 531 U.S. 812, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000). Moreover, both *Adair I* and *Adair II* announce that water must be maintained at some level on the land to fulfill the purpose of the reservation. In *Adair II*, the Ninth Circuit could not have been more clear that it intended to "prevent other appropriators from depleting the streams and waters below a protected level in any area where the non-consumptive [water] right applies." *Adair II*, 723 F.2d at 1411.

With these arguments put to rest, this Court must reconcile the quantification standard announced in *Adair I*, with the "moderate living" standard announced in *Adair II*. The two standards are not in conflict and what Defendants have apparently lost sight of is that the initial quantification of water rights is a separate analysis from the "moderate living" standard. The adjudicator is called upon to first quantify the Tribes' water rights to establish an allocation of water to fulfill the purpose of the reservation. Only after the quantification stage can the "moderate living" doctrine be considered to possibly adjust the quantification.

### 1. Step One—Quantifying the Water Right

*Adair I* announced the legal standard for quantifying the Tribes' water rights by holding:

> The Indians are still entitled to as much water on the Reservation lands as they need to protect their hunting and fishing rights. If the preservation of these rights requires that the Marsh be maintained as wetlands and that the forest be maintained on a sustained-yield basis, then the Indians are entitled to whatever water is necessary to achieve those results.

*Adair I*, 478 F.Supp. at 345–46. *Adair II* and the "moderate living" standard did not change this threshold quantification standard.

■ The quantification standard does not involve an analysis of any actual beneficial use of the water, or any actual harvest of treaty protected resources on a fixed day or time in history. *Adair II*, 723 F.2d at 1406 n. 11; *see also Arizona v. California*, 373 U.S. 546, 598, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) ("*Arizona I*") (reserved water rights measured by "practicably irrigable acres" to fulfill treaty purposes, and not based upon number of Indians on reservation or actual use of land). Instead, the focus must be on fulfilling the purpose of the reservation. *Id.*

■ *Adair II* held that there were two primary purposes of the reservation and accompanying implied water rights. One was to support Klamath agriculture, and the other, which is at issue here, was "for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands." *Adair II*, 723 F.2d at 1409. In order to provide the Tribe an opportunity to continue hunting and fishing on the reservation lands, it is axiomatic that there be sufficient water to support productive habitat so there may be game to hunt, and fish to fish, as well as edible plants to gather. As *Adair I* announced, this may require that the "Marsh be maintained as wetlands" and that the "forest be maintained on a sustained-yield basis." *Adair I*, at 345–46. Quantifying the reserved water right so that productive habitat can be supported is the only meaningful way to measure the water requirements to meet the goal of fulfilling the purpose of the reservation.

■ Defendants interpret the rulings in this case to hold that Plaintiffs are "entitled to the minimum amount of water necessary to protect the Tribes' hunting and fishing water rights," and that "the minimum amount necessary is a factual

determination that must be made based upon the material supplied by the claimants." Although there seems to be no dispute that Plaintiffs carry the initial burden of proving that a certain amount of water is needed to support productive habitat, the assertion that the tribes are entitled only to some "minimum amount" of water is an incorrect statement of the law. In quantifying the right under *Adair I*, the Tribe is entitled to "whatever water is necessary to achieve" the result of supporting productive habitat. *Adair I*, 478 F.Supp. at 346. Once the adjudicator has quantified the Tribes' water rights under the principles announced in *Adair I*, the moderate living standard may be considered.

### 2. Step Two—The Moderate Living Standard

■ In *Adair II*, the Ninth Circuit Court of Appeals stated that:

"Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but not more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living." 443 U.S. at 686, 99 S.Ct. at 3075. Implicit in this "moderate living" standard is the conclusion that Indian tribes are not generally entitled to the same level of exclusive use and exploitation of a natural resource that they enjoyed at the time they entered into the treaty reserving their interest in the resource, unless, of course, no lesser level will supply them with a moderate living. *See Washington v. Fishing Vessel Ass'n*, 443 U.S. at 686, 99 S.Ct. at 3074–75. As limited by the "moderate living" standard enunciated in *Fishing Vessel*, we affirm the district court's decision that the Klamath Tribe is entitled to a reservation of water, with a priority date of immemorial use, sufficient to support exercise of treaty hunting and fishing rights.

*Adair II*, 723 F.2d 1414–15.

■ Under the traditional application of the moderate living standard, the initial quantification of a reserved right may be limited "if tribal needs may be satisfied by a lesser amount." *Washington v. Fishing Vessel Ass'n*, 443 U.S. 658, 685, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). However, this case is unlike *Fishing Vessel* where the reserved right could be reduced without completely frustrating the purpose of the reservation. For example, if the tribes' 50% allocation of the harvestable fish run at issue in *Fishing Vessel* would have been reduced to a 35% allocation, the reserved right would still survive after the reduction. In contrast, the Klamath Tribes' reserved water right does not readily lend itself to such a reduction. Ultimately, the water level cannot be reduced to a level below that which is required to support productive habitat, and the Tribes are entitled to "whatever water is necessary to achieve" the result of supporting productive habitat. This would be true even if there were fewer members of the Tribe. Reducing the water level below a level which would support productive habitat would have the result of abrogating the reserved rights. Because only Congress can abrogate treaty rights, and it has not done so here, the moderate living standard cannot be applied to have the effect of reducing water levels below a level that would support productive habitat.

To the extent the moderate living standard can be applied in this case, the Supreme Court's guidance in *Fishing Vessel* on the burden of persuasion and the applicable legal test was followed in *United States v. Washington*, 873 F.Supp. 1422, 1445–46 (W.D.Wash.1994) [hereinafter *Shellfish I*], aff'd. in relevant part, rev'd in part, 135 F.3d 618 (9th Cir.1998), opinion amended and superceded on other matters, 157 F.3d 630 (9th Cir.1998). The district court in *Shellfish I* looked for "persuasive evidence ... presented to the

Court by the State and the interveners [parties opposing the tribal right]" demonstrating that the full resource amount claimed by the tribes was in fact not necessary to provide the tribes with a moderate living. *Id.* 873 F.Supp. at 1445. Because the parties opposing the tribal right did not present sufficient persuasive evidence, the district court in *Shellfish I* did not apply the moderate living standard to reduce the treaty right from its initial allocation. The same burdens should be used to the extent non-tribal parties seek to reduce the Tribes' water rights based on the moderate living standard. However, if reducing the full resource amount would result in reducing the water level below that which is necessary to support productive habitat, no such reduction may be made regardless of the outcome of the moderate living standard analysis.

### 3. *"As currently exercised"*

■ The parties dispute the meaning of the "as currently exercised" language in *Adair II* where the Court of Appeals "confirm[ed] to the Tribe the amount of water necessary to support its hunting and fishing rights *as currently exercised* to maintain the livelihood of the Tribe members, not as these rights once were exercised." *Adair II*, 723 F.2d at 1414 (emphasis added). Some defendants have interpreted this phrase to be the definitive measure for quantifying the tribal water right in the KBA. Under these defendants' interpretation, the amount of water associated with the Tribes' right is fixed by a specific date in 1979—the date of the *Adair I* decision. For example, Oregon's Preliminary Evaluation concluded that the Tribes' right is to "that amount of unconsumed water flowing through [each described reach] as of September 27, 1979, the date of [*Adair I*], or the quantity of water claimed by the BIA for physical habitat maintenance flows, whichever is less." Some private defendants also assert that water flows in 1979 or 1984 (the date of *Adair II* ) are the proper measure of the Tribes' water rights.

Defendants' interpretations conflict with the meaning of *Adair II* and are inconsistent with the cases relied upon therein. In particular, in *Fishing Vessel* the Supreme Court did not limit the Indian treaty harvest of the fishery to the number of fish that were currently being harvested as of the date of the opinion, or on any other fixed date. By the time of the *Fishing Vessel* litigation, the Indian harvest had shrunk to only about 2% of the harvestable fishery and current fishery management "exclude[d] most Indians from participating in it." *Fishing Vessel*, 443 U.S. at 669, 99 S.Ct. 3055. Rather, *Fishing Vessel* confirmed 50% of the harvest to the tribes (unless opponents could prove that a lesser share was appropriate under the "moderate living" standard) and confirmed that the treaty fishing right remained undiminished by the fact that non-treaty fishermen had, at the time of the litigation, overwhelmed Indian participation in the fishery. *Id.* at 684–87, 99 S.Ct. 3055. Similarly, in *Arizona I*, which *Fishing Vessel* relied upon, the court confirmed enough water to the tribes to irrigate all irrigable acres on their reservation lands regardless of the amount of irrigation then currently being exercised by the tribes. *Arizona I*, 373 U.S. at 600–01, 83 S.Ct. 1468.

Defendants' interpretations have the effect of assigning a 1979 (or 1984) priority date to the Tribes' water right. This result cannot be reconciled with this Court's holding, which was affirmed in *Adair II*, that the Tribes' priority date is "time immemorial." Moreover, a stream without water cannot be reconciled with the purpose of the tribal right which is to "guarantee continuity of the Indians' hunting and gathering lifestyle," (*Adair II*, 723 F.2d at 1412–13), and its acknowledgment that "the treaty is not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." *Id.*, quoting *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). Fixing the tribal water rights to a

specific date is not related to the fulfill-ment of purposes of the Klamath Indian Reservation, which is the paramount con-sideration mandated by *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).

The "as currently exercised" phrase re-fers only to the moderate living standard which recognizes that changing circum-stances can affect the measure of a re-served right. *Fishing Vessel,* 443 U.S. at 686–87, 99 S.Ct. 3055. The "as currently exercised" language does not set a water right to a level in 1979 or 1984, for that would clearly be contrary to the intent of *Adair II.* This is the only way to interpret the phrase to be consistent with the rest of *Adair II,* to not result in changing the Tribes' priority date, and to not result in abrogating the Tribes' reserved rights.

### C. Hufford Defendants' Preclusion Argument

A significant portion of the Hufford De-fendants' opening brief is devoted to their contention that "[t]he Klamath Tribes and their members have relinquished their rights to hunt, fish and gather and all interests in water incident thereto through disposal of the lands upon which those rights, under the Treaty of 1864, were necessarily appurtenant." Memorandum of Private Defendants, p. 43. This conten-tion was rejected by Judge Solomon in *Adair I.* It is too late to relitigate that issue now, over twenty years later.

The Hufford Defendants also contend that an award of compensation made by the Court of Claims in 1971 extinguished water rights under Article I of the Treaty. The short answer is that this argument could and should have been asserted in *Adair I,* which was decided in 1979. It is too late now. Finally, in their reply brief, the Hufford Defendants assert that they need more time to marshal evidence in support of their preclusion argument, and seek to delay a decision on that defense. However, no additional "evidence" can change the fact that this argument comes twenty years too late.

## CONCLUSION

For the foregoing reasons, it is hereby Ordered and Declared that: (1) the Kla-math Tribes' water rights include a right to water to support resources the Tribes gather, in addition to the resources they hunt, fish, and trap; (2) *Adair I* an-nounced the standard for quantifying the tribal water right; and (3) the "moderate living" standard has limited application in this case, but could be used to adjust the initial quantification of the tribal water right upon a proper showing by non–tribal opponents. In no event shall the adjudica-tor quantify or reduce the Tribal water right to a level below that which is neces-sary to support productive habitat.