**Certiorari Denied, No. 31,377, November 20, 2008**

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2009-NMCA-004**

**Filing Date:    September 24, 2008**

**District No.  27,654**

**STATE OF NEW MEXICO ex rel.**
**STATE ENGINEER,**

>    **Plaintiff-Appellee,**

**and**

**UNITED STATES OF AMERICA,**
**JICARILLA APACHE NATION,**
**NAVAJO NATION, UTE MOUNTAIN**
**UTE TRIBE, SAN JUAN WATER**
**COMMISSION, and BHP NAVAJO COAL**
**COMPANY,**

>    **Defendants/Intervenors-Appellees,**

**v.**

**COMMISSIONER OF PUBLIC LANDS**
**FOR THE STATE OF NEW MEXICO,**

>    **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Rozier E. Sanchez, District Judge Pro Tempore**

Gary K. King, Attorney General
DL Sanders, Chief Counsel
Tracy L. Hofmann, Special Assistant Attorney General
Santa Fe, NM

1

for Appellee

United States Department of Justice, Environment & Natural Resources Division
Ronald J. Tenpas, Assistant Attorney General
David W. Gehlert
Mark R. Haag
Washington, D.C.

for Appellee United States of America

Holland and Knight
Shenan R. Atcitty
Albuquerque, NM

for Appellee Jicarilla Apache Nation

Navajo Nation Department of Justice
Stanley M. Pollack
Bidtah Becker
Window Rock, AZ

for Appellee Navajo Nation

Daniel H. Israel
Boulder, CO

for Appellee Ute Mountain Ute Tribe


Taylor & McCaleb, P.A.
Jolene L. McCaleb
Elizabeth Newlin Taylor
Corrales, NM

for Appellee San Juan Water Commission

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Maria O'Brien
Walter E. Stern
Albuquerque, NM

for Appellee BHP Navajo Coal Company

New Mexico State Land Office

Robert A. Stranahan, IV, General Counsel
Stephen G. Hughes, Associate Counsel
John L. Sullivan, Associate Counsel
Santa Fe, NM

for Appellant

Ryley Carlock & Applewhite
James M. Noble
Denver, CO

for Amicus Curiae Freeport-McMoRan Corporation

Tanya Trujillo
Christopher D. Shaw
Santa Fe, NM

for Amicus Curiae New Mexico Interstate Stream Commission

Gallegos Law Firm, P.C.
J.E. Gallegos
Michael J. Condon
Santa Fe, NM

Terry Goddard, Attorney General
Patrick B. Sigl, Assistant Attorney General
Phoenix, AZ

for Amicus Curiae State of Arizona

## OPINION

**WECHSLER, Judge.**

{1}     This appeal arises from a district court subfile proceeding in the course of a general adjudication of water rights in the San Juan River stream system.  At issue is the applicability of the federal reserved water rights doctrine to state lands that the federal government granted and conveyed to New Mexico in trust for the purpose of supporting New Mexican schools.  As the manager and acting trustee for New Mexico's trust lands, the Commissioner of Public Lands for the State of New Mexico (the Commissioner) asserted a claim in the underlying adjudication for federal reserved water rights.  The Commissioner argued that by legislatively designating specific sections of land to be used for the support of New Mexican schools and conveying them in trust to New Mexico, the United States

3

Congress also impliedly intended to reserve and convey water rights in those lands. The State Engineer of the State of New Mexico (the State Engineer) and several other interested parties opposed the Commissioner's claim. Ultimately, the district court granted summary judgment in favor of the parties opposing the Commissioner. For the reasons that follow, we affirm the district court's decision and hold that the federal reserved water rights doctrine does not apply in this case.

## HISTORICAL BACKGROUND

**{2}** Since 1802, the United States Congress has passed enabling acts that have granted federal lands to each new "public-land" state admitted to the Union for the purpose of supporting its schools. *Andrus v. Utah*, 446 U.S. 500, 506 (1980). Unlike the original thirteen states, many newly created states, including New Mexico, encompassed vast tracts of federal land that were immune from taxation. *Id.* at 522 (Powell, J., dissenting). In order to put those new states on equal footing with the original thirteen states in generating revenue for the public good, Congress granted them "a fixed proportion of the lands within [their] borders for the support of public education" in exchange for a "pledge not to tax" the granted lands. *Id.* at 523. Following approval of the federal survey, "[t]itle to the sections vested in the [s]tate." *Id.* Thereafter, the state became subject to "a binding and perpetual obligation to use the granted lands for the support of public education," and "[a]ll revenue from the sale or lease of the school grants was impressed with a trust in favor of the public schools." *Id.* at 523-24.

**{3}** Congress first promised some of the school trust lands at issue in this case in the Organic Act of 1850. *See* ch. 49, § 15, 9 Stat. 446, 452 (1850). Several decades later, Congress enacted the Ferguson Act of 1898, ch. 489, § 1, 30 Stat. 484, 484 (1898), which granted to the Territory of New Mexico the lands promised in the Organic Act, along with some additional lands. Finally, Congress conveyed the school trust lands at issue in this case to the State of New Mexico in the Enabling Act of 1910, ch. 310, §§ 1, 10, 36 Stat. 557, 557-58, 563 (1910), which authorized the establishment of the State. The Enabling Act included additional lands and transferred to the State the lands that Congress had previously granted to the Territory in the Ferguson Act. *See* Enabling Act §§ 6-10, 36 Stat. at 561-65. The Enabling Act also imposed specific trust obligations upon the State with respect to its management of the lands, including detailed limitations on the State's use of the proceeds from the sale, rental, and use of them. *See id.* § 10, 36 Stat. at 563-64. In this case, the Commissioner relies on these statutes in support of his claim to federal reserved water rights in New Mexico's school trust lands, and we will discuss each statute in greater detail in our analysis of the merits of the Commissioner's claim.

## PROCEDURAL BACKGROUND

**{4}** On March 13, 1975, the State Engineer commenced the general stream adjudication at issue in this case by filing a complaint in district court. Roughly nineteen years later, on August 13, 2004, the Commissioner became involved in the adjudication by filing a

4

"Declaration of State of New Mexico Trust Reserved Water Rights" (Declaration). The Commissioner's Declaration described the basis upon which he anticipated claiming federal reserved water rights as part of the adjudication. In doing so, the Commissioner claimed, under federal law, the state trust's entitlement to reserved surface and groundwater rights for approximately 281,155 acres of school trust land within the San Juan Groundwater Basin. After the district court set a briefing schedule regarding the Commissioner's Declaration, the Commissioner attempted to either withdraw or dismiss his Declaration without prejudice by invoking Rule 1-041(A)(1)(a) NMRA. The district court refused to allow the Commissioner to withdraw or dismiss his Declaration, and this Court subsequently denied the Commissioner's petition for an interlocutory appeal of that ruling.

{5} On June 15, 2006, the State Engineer petitioned for the commencement of a subfile proceeding on the Commissioner's Declaration. In the subfile proceeding, the Commissioner moved for declaratory relief with respect to his argument that there existed federal reserved water rights in New Mexico's school trust lands, and the State Engineer moved for summary judgment that no such rights existed in those lands. Shortly thereafter, the United States, along with several other interested parties, intervened in the proceeding.

{6} On February 20, 2007, the district court issued an order denying the Commissioner's request for declaratory relief and granting summary judgment in favor of the State Engineer. In doing so, the district court concluded that the federal reserved water rights doctrine did not apply to the school trust lands at issue in this case and set forth several reasons why the Commissioner's claim failed. First, the district court found that the "specific purpose" argued by the Commissioner as the basis for Congress's decision to convey the trust lands did not, under the applicable federal case law, require a conclusion that it also impliedly reserved water rights. Specifically, the district court reasoned that the application of water to the land was not a direct purpose of granting the land. *See, e.g.*, *United States v. New Mexico*, 438 U.S. 696, 716-17 (1978) (explaining that when a potential use of water is not "a direct purpose of reserving the land," there can be no finding of an implied reservation of water rights). Second, the district court noted that unlike the federal reservations that have been held to include federal reserved water rights, the United States did not retain any ownership interest in the school trust lands. *See, e.g.*, *Cappaert v. United States*, 426 U.S. 128, 131-32, 138 (1976) (concluding that Congress impliedly reserved water rights in land owned by the United States that was "set aside as a national monument"). Finally, the district court concluded that congressional intent to reserve water rights in the school trust lands could not be inferred because "Congress made no declaration in [the legislation upon which the Commissioner relies] that the New Mexico Education System, without water, would be entirely defeated." *See New Mexico*, 438 U.S. at 700 ("Each time this Court has applied the 'implied-reservation-of-water doctrine,' it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated."). Based on these findings, the district court concluded that the Commissioner failed to meet his burden of showing that (1) Congress intended to withdraw and reserve federal lands "for New Mexico Trust Lands as a federal purpose" and (2) "Congress

5

intended to reserve, by implication, appurtenant waters to accomplish educational purposes in New Mexico Trust Lands." The Commissioner appeals from that ruling.

**WITHDRAWAL OR DISMISSAL UNDER RULE 1-041**

**{7}**     We first address the Commissioner's contention that the district court erred in refusing to allow him to withdraw or dismiss his Declaration. The Commissioner argues that he had an "unconditional" right to withdraw or dismiss his Declaration without prejudice under either Rule 1-041(A)(1)(a) or Rule 1-041(C). In response, the parties opposing the Commissioner argue that (1) Rule 1-041 does not apply to the Commissioner's Declaration; (2) even if Rule 1-041 were applicable, the Commissioner would not have an unconditional right to withdraw or dismiss his Declaration; and (3) the district court properly refused to allow the Commissioner to withdraw or dismiss his Declaration. We review de novo the issue of whether the Commissioner had an unconditional right to voluntarily withdraw or dismiss his Declaration without prejudice under Rule 1-041. *See Becenti v. Becenti*, 2004-NMCA-091, ¶ 6, 136 N.M. 124, 94 P.3d 867 ("[W]hen called upon to apply and interpret rules of civil procedure, we review these questions de novo.").

**{8}**     We first observe that, by its terms, Rule 1-041(A)(1)(a) does not apply to the Commissioner's Declaration. Rule 1-041(A)(1)(a)  provides that "an *action* may be dismissed by the *plaintiff* without order of the court . . . by filing a notice of dismissal at any time before service by the adverse party of an answer or other responsive pleading." (Emphasis added.) In this case, the Commissioner is not a "plaintiff" in the underlying adjudication, which is a special statutory proceeding commenced by the State Engineer. *See* NMSA 1978, § 72-4-15 (1907) (stating that it is, in most instances, the responsibility of the attorney general, at the request of the state engineer, to file suit to determine the respective rights of individual parties to appropriate water from a stream system). Additionally, the Commissioner's Declaration does not constitute an "action" that can be voluntarily dismissed. We view the Declaration as a single claim within the overarching water adjudication action brought by the State Engineer in 1975, and as such, Rule 1-041(A) does not permit a voluntary dismissal of the Declaration. *See Gates v. N.M. Taxation & Revenue Dep't*, 2008-NMCA-023, ¶ 12, 143 N.M. 446, 176 P.3d 1178 (explaining that Rule 1-041(A) does not permit a plaintiff to dismiss less than all of the claims that make up an action). Finally, no responsive pleading was required, or even allowed, in this case with respect to the Commissioner's Declaration. *Compare* Rule 1-012(A)-(B) NMRA (explaining the procedure that a defendant in a civil action is required to follow in filing a responsive pleading), *with* NMSA 1978, § 72-4-17 (1965) (explaining the procedure that the district court must follow in determining the water rights of individual claimants with respect to a stream system).

**{9}**     Alternatively to his purported right to voluntarily dismiss his Declaration under Rule 1-041(A), the Commissioner argues that Rule 1-041(C) governs. Rule 1-041(C) allows for the same type of voluntary dismissal described in Rule 1-041(A) for "any counterclaim, cross-claim or third-party claim." However, we agree with the State Engineer that the

Commissioner's Declaration does not fall under this rule. We simply cannot characterize his Declaration as either a counterclaim, a cross-claim, or a third-party claim. *See* Rule 1-013(A)-(B) NMRA (explaining that a counterclaim is a claim that a defendant in a civil action has against a plaintiff in the same action); Rule 1-013(G) (explaining that a cross-claim is a claim that one party in a civil action has against a co-party in the same action); Rule 1-014(A) NMRA (explaining that a defendant in a civil action may make a third-party claim against "a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him").

**{10}** Furthermore, even if we were to conclude, contrary to our legal holding above, that the Commissioner was a plaintiff and that his Declaration was an action, counterclaim, cross-claim, or third-party claim subject to Rule 1-041, our result would not change. The purpose of Rule 1-041(A) "is to preserve a plaintiff's right to dismiss an action unilaterally, but to limit that right to an *early stage* of the litigation." 8 James W. Moore, *Moore's Federal Practice* § 41.33[1], at 41-45 (3d ed. 2007) (emphasis added). "The rule is thus intended to fix the point at which the resources of the court and the defendant are so committed that dismissal without preclusive consequences can no longer be had as of right." *Id.* § 41.33[1], at 41-45 to -46 (internal quotation marks and citation omitted). The stream adjudication at issue in this case is over thirty years old, the notice of withdrawal of the Declaration was filed nearly a year after the filing of the Declaration, and a delay in the litigation of the substance of the Commissioner's claim would cause even further unnecessary delay, waste judicial resources, and trigger great uncertainty regarding the individual claimants' respective water rights.

**{11}** Accordingly, we agree with the district court that Rule 1-041 was not a procedural vehicle that was available to the Commissioner in this case. We therefore proceed to address the merits of the federal reserved water rights claim that the Commissioner made in his Declaration.

**SUMMARY JUDGMENT**

**A.     Standard of Review**

**{12}** "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. In reviewing whether a genuine issue of material fact exists, "we view the facts in the light most favorable to the party opposing summary judgment." *Gormley v. Coca-Cola Enters.*, 2005-NMSC-003, ¶ 8, 137 N.M. 192, 109 P.3d 280 (internal quotation marks and citation omitted). Ultimately, we review de novo the legal question of whether a party is entitled to summary judgment as a matter of law. *Id.*

**{13}** The Commissioner argues that the question of implied congressional intent to create federal reserved water rights presents a factual issue to be decided by a factfinder and that the district court therefore erred in concluding that no such rights exist in the school trust

7

lands as a matter of law. However, whether a particular act of Congress establishes a federal reservation with attendant implied water rights is a question of legislative intent that requires an interpretation of the relevant acts. *See Cappaert*, 426 U.S. at 139 ("In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water."). Such matters are traditionally legal questions that may properly be resolved on summary judgment. *See Union Pac. Land Res. Corp. v. Moench Inv. Co.*, 696 F.2d 88, 93 n.5 (10th Cir. 1982) ("Questions of statutory construction and legislative history traditionally present legal questions properly resolved by summary judgment."). Other aspects of federal reserved water rights, beyond the mere existence of such rights in a given piece of land, may involve questions of fact that should not be decided on summary judgment. For example, a determination of the quantity of water reserved (i.e., the minimum amount necessary to accomplish the purpose of the reservation) would likely involve factual issues that would require the factfinder to consider expert testimony. *See, e.g.*, *United States v. Washington*, 375 F. Supp. 2d 1050, 1066 (W.D. Wash. 2005) (noting that the quantity of water impliedly reserved in an Indian reservation under a treaty was "a factual issue to be determined at trial"). However, the only issue in the present case involves whether certain acts of Congress can be interpreted to impliedly create *any* federal reserved water rights in New Mexico's school trust lands. Any inquiry relating to the nature and quantity of the rights that the Commissioner claims is not before this Court. Thus, we are presented with questions of law that the district court was permitted to decide on summary judgment and that we must now review de novo.

### B.    The Federal Reserved Water Rights Doctrine and Its Relationship to State Water Law

**{14}**    The federal reserved water rights doctrine is a judicially created doctrine that had its genesis in *Winters v. United States*, 207 U.S. 564 (1908). In *Winters*, the United States Supreme Court recognized and affirmed the power of the federal government, under certain circumstances, to impliedly reserve water and exempt it from appropriation under state law. *Id.* at 577. In doing so, the Court concluded that when Congress established the Fort Belknap Indian Reservation in Montana, it also impliedly reserved with it the right to the amount of water necessary to achieve the reservation's purpose. *Id.* at 565, 577. Subsequent United States Supreme Court decisions extended the doctrine to other, non-Indian federal enclaves. *See, e.g.*, *Cappaert*, 426 U.S. at 138 (finding that the reservation of a national monument by executive order also included federal reserved water rights); *Arizona v. California*, 373 U.S. 546, 601 (1963) (concluding that "the principle underlying the reservation of water rights for Indian Reservations" could be extended to national recreation areas and national forests), *disavowed on other grounds by California v. United States*, 438 U.S. 645, 674 (1978). As elaborated on and defined in these decisions, the doctrine currently requires a claimant to establish two elements in order to demonstrate the existence of a federal reserved water right: (1) that the federal government withdrew the land from the public domain and reserved it for a federal purpose and (2) that a certain amount of water is necessary to accomplish the purpose for reserving the land. *See Cappaert*, 426 U.S. at

8

138.

**{15}** Overall, the doctrine of federal reserved water rights represents a limited exception to the general rule that individual states govern water rights within their respective borders. *See New Mexico*, 438 U.S. at 702 ("Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law."). Generally, water rights must be obtained by appropriation under state water law, even if those rights are developed in land owned by the federal government. *See Cal. Or. Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 163-64 (1935) (stating that "following the [Desert Land Act] of 1877, if not before, all non-navigable waters then a part of the public domain became *publici juris*, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain"). In New Mexico, water law is governed by the doctrine of prior appropriation. *Walker v. United States*, 2007-NMSC-038, ¶ 21, 142 N.M. 45, 162 P.3d 882. Under that doctrine, "water rights are both established and exercised by beneficial use, which forms the basis, the measure and the limit of the right to use of the water." *Id.* ¶ 22 (internal quotation marks and citation omitted). The appropriation of water for beneficial use establishes the priority date of a water right in relation to other water rights, and the full right of an earlier appropriator will be protected, to the extent of that appropriator's use, against a later appropriator. *See* N.M. Const. art. XVI, § 2 ("Priority of appropriation shall give the better right."). However, because the prior appropriation doctrine rewards the use of water—and use determines both the priority date and quantity of water to which one holds a right under the doctrine—state water rights can be forfeited by non-use. *State ex rel. Reynolds v. S. Springs Co.*, 80 N.M. 144, 148, 452 P.2d 478, 482 (1969) ("[U]nder the prior appropriation doctrine of water rights applicable in New Mexico, nonuse involves forfeiture." (internal quotation marks and citation omitted)).

**{16}** Similar to water rights developed under our state law, federal reserved water rights have the attributes of priority and quantity, allowing such rights to be administered within the hierarchy of state water rights. *See Navajo Dev. Co. v. Sanderson*, 655 P.2d 1374, 1379-80 (Colo. 1982) (en banc). However, the determination of those attributes for a federal reserved water right follows a far different logic from that of a state water right. *See id.* at 1379 ("Federal reserved water rights must be understood as a doctrine which places a federal appropriator within the state appropriation scheme by operation of federal law."). Unlike a state water right, the priority of a federal reserved water right is not established by appropriation for beneficial use; rather, such a right is determined by the withdrawal and reservation of the applicable land for a federal purpose. *See United States v. Jesse*, 744 P.2d 491, 493-94 (Colo. 1987) (en banc). A federal reserved water right, therefore, has a priority date corresponding to the date of the statute, executive order, or treaty creating the reservation, regardless of whether the water at issue has ever been put to actual use. *See id.* at 494. Similarly, the quantity of a federal reserved water right is not determined by the amount of water put to beneficial use; rather, it is determined by the amount of water necessary to carry out the primary purpose of the reservation. *Id.* Further, as is apparent

from the fact that the priority date of a federal reserved water right is unconnected to the use of water, such a right cannot be lost by non-use, unlike a water right secured under state law. *Id.*

**{17}** Thus, as the Colorado Supreme Court observed in *Jesse*:

> In contrast to the doctrine of prior appropriation, which . . . recognizes only the right to divert a quantified amount of water at a specific location for a specific purpose, the federal doctrine of reserved water rights vests the United States with a dormant and indefinite right that may not coincide with water uses sanctioned by state law.

*Id.* (citations omitted). Such dormant and indefinite rights can be very problematic when it comes to adjudicating and administering water rights in an arid state, such as New Mexico. Many stream systems in such states are already fully appropriated, and a determination that federal reserved water rights exist often requires "a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators." *New Mexico*, 438 U.S. at 705. Further, as demonstrated by this case, claims to federal reserved water rights are potentially very large with very early priority dates and can therefore be highly disruptive to rights existing under state law. *See Jesse*, 744 P.2d at 494 ("Because the priority date of the [federal] reserved right relates back to the date of the reservation, reserved water rights threaten existing appropriators with divestment of their rights without compensation."). Accordingly, in recognition of the predominance of state law in the area of water rights and the potentially substantial and detrimental impact on state rights in fully appropriated stream systems, courts must construe the doctrine of federal reserved water rights narrowly. *See id.* Our analysis of the Commissioner's claim to federal reserved water rights in New Mexico's school trust lands therefore follows this principle of narrow construction.

## C. Withdrawal and Reservation

**{18}** "In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the threshold question necessarily is whether the government has in fact withdrawn the land from the public domain and reserved it for a public purpose." *Sierra Club v. Block*, 622 F. Supp. 842, 853 (D. Colo. 1985). Despite their facial similarities, the terms "withdrawal" and "reservation" have distinct meanings when used in the context of public land law. *Id.* at 854-55. As the Tenth Circuit Court of Appeals recently explained,

> A withdrawal makes land unavailable for certain kinds of private appropriation . . . . It temporarily suspends the operation of some or all of the public land laws, preserving the status quo while Congress or the executive decides on the ultimate disposition of the subject lands.
>
> A reservation, on the other hand, goes a step further: it not only

10

withdraws the land from the operation of the public land laws, but also dedicates the land to a particular public use.

*S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 784 (10th Cir. 2005) (citations omitted). Ultimately, the act of withdrawing and reserving land ensures that it will not be transferred out of federal ownership pursuant to homesteading or other land disposal statutes. *See Winters v. United States*, 143 F. 740, 748 (9th Cir. 1906) ("[W]hen the lands of the government have been legally appropriated or reserved for any purpose, they become severed from the public lands, and . . . no subsequent law or sale should be construed to embrace or operate upon them."); *see also Sierra Club v. Watt*, 659 F.2d 203, 206 (D.C. Cir. 1981) (concluding that a claim for federal reserved rights failed because "Congress did not withdraw land from the public domain when it passed the [act in question], it merely set forth purposes, goals and authority for the use of the public domain" (internal quotation marks and citation omitted) (footnote omitted)).

**{19}** The Commissioner essentially asks us to consider the requirements of withdrawal and reservation to be formalistic criteria that are unnecessary for the creation of a federal reservation of land. According to the Commissioner, the "reserved rights doctrine focuses on the purpose of the reservation, not the mechanics." However, this statement presupposes that a federal withdrawal and reservation of land has actually occurred. As we have explained, the question of whether a withdrawal and reservation has occurred necessarily involves mechanics. The Commissioner does not reference any case in which a court has held that federal reserved water rights existed on land that was not previously withdrawn and reserved, and we are aware of no such case.

**{20}** In the seminal cases in which the United States Supreme Court considered the existence of implied federal reserved water rights—including *New Mexico*, *Cappaert*, *Arizona*, and *Winters*—the Court did not focus on the threshold question of whether the relevant congressional acts, executive orders, or treaties withdrew land from the public domain and created a reservation for a federal purpose. In each of those cases, it was undisputed that the federal government had done so. *See, e.g.*, *New Mexico*, 438 U.S. at 707 (national forests); *Cappaert*, 426 U.S. at 140-41 (national monuments); *Arizona*, 373 U.S. at 601 (national recreation areas, national wildlife refuges, and national forests); *Winters*, 207 U.S. at 577 (Indian reservations). Therefore, those cases are only helpful to our analysis as models of what constitutes, as opposed to what does not constitute, a withdrawal and reservation of land for a federal purpose. Our question is whether the legislation on which the Commissioner relies actually created a federal reservation of the school trust lands at issue by withdrawing and reserving them for a particular public use to further a federal purpose.

**{21}** First, the Commissioner relies on the Organic Act of 1850, which established the boundaries of the Territory of New Mexico and provided for the establishment of a territorial government. Sections 2-5, 9 Stat. at 447-49. In accordance with the federal government's policy of granting public domain land to new "public-land" states in furtherance of

11

supporting public education, *see Andrus*, 446 U.S. at 506, the Organic Act provided as follows:

> [W]hen the lands in said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same.

Section 15, 9 Stat. at 452. In making his argument, the Commissioner seizes on the term "reserved" in this provision to support his position that the Act satisfied the threshold requirement of creating a reservation. However, the mere use of the term "reserved" in a congressional act does not necessarily create a federal withdrawal and reservation of land. *See S. Utah Wilderness Alliance*, 425 F.3d at 785 ("[J]ust because a withdrawal uses the term 'reserved' does not mean that it reserves land 'for public uses.'"). As the United States Supreme Court has explained, when Congress granted school trust lands to the Western states, it neither withdrew nor reserved those lands. In fact, "[p]rior to survey, those sections [were] a part of the public lands of the United States and [could have been] disposed of by the Government in any manner and for any purpose consistent with applicable federal statutes." *United States v. Wyoming*, 331 U.S. 440, 443 (1947); *see also United States v. Morrison*, 240 U.S. 192, 198-99, 210 (1916) (concluding that language similar to the Organic Act in the congressional act creating the Territory of Oregon meant that title did not immediately vest in Oregon and that "Congress was at liberty to dispose of the land" until "the sections were defined by survey"); *Dallas v. Swigart*, 24 N.M. 1, 6, 172 P. 416, 417 (1918) ("[T]he reservation from entry under the general land laws shall come into operation only when the [school trust] lands are surveyed in the field, whereupon they are withdrawn from entry."). The Organic Act, like the statute at issue in *Wyoming*, made conveyance of the designated lands subject to the completion of the official survey, which, as the Commissioner acknowledges, did not occur until many years later. Until completion of the survey, the trust lands remained in the public domain and were subject to disposal by the federal government. Thus, the Organic Act did not contemplate a withdrawal or reservation of the lands that it identified for purposes of now asserting a federal reserved water rights claim. *See S. Utah Wilderness Alliance*, 425 F.3d at 784 (explaining that withdrawal for the purpose of asserting a federal implied water right requires a temporary suspension of "the operation of some or all of the public land laws").

**{22}**    Second, the Commissioner relies on the Ferguson Act of 1898, which was essentially the realization of Congress's promise in the Organic Act to grant the Territory of New Mexico sections sixteen and thirty-six of each township in the Territory. Ferguson Act § 1, 30 Stat. at 484. Of importance in this case, Section 1 of the Ferguson Act, passed roughly fifty years after the Organic Act, indicates that at least some of the lands promised in the Organic Act had either been disposed of by the federal government or officially reserved by the federal government; therefore, the Act promised the Territory of New Mexico indemnity

lands to compensate for those lands that were no longer available in sections sixteen and thirty-six. Ferguson Act § 1, 30 Stat. at 484. Section 1 states:

> [S]ections numbered sixteen and thirty-six in every township of the Territory of New Mexico, and where such sections, or any parts thereof, are mineral or have been sold or otherwise disposed of by or under the authority of any Act of Congress, other non-mineral lands equivalent thereto . . . in lieu of which the same is taken, are hereby granted to said Territory for the support of common schools, such indemnity lands to be selected within said Territory in such manner as is hereinafter provided: *Provided*, That the sixteenth, and thirty-sixth sections embraced in permanent reservations for national purposes shall not at any time be subject to the grants of this Act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants of this Act[.]

*Id.* We infer from this promise of different lands to compensate for Congress's disposal or reservation of lands within the promised sections that Congress was well aware of its ability to reserve lands for a federal purpose, as well as the technical requirements for doing so, and that it chose not to create a federal reservation with respect to New Mexico's school trust lands.

**{23}** Finally, the Commissioner relies on the Enabling Act of 1910, which ushered the Territory of New Mexico into statehood. Section 1, 36 Stat. at 557-58. Among other things, the Enabling Act recognized that sections sixteen and thirty-six had already been granted to the Territory and additionally granted "sections two and thirty-two in every township . . . for the support of common schools." *Id.* § 6, 36 Stat. at 561. As it did in the Ferguson Act, Congress guaranteed in the Enabling Act indemnity lands to be granted when portions of the newly designated sections were or became unavailable because they

> [were] mineral, or [had] been sold, reserved, or otherwise appropriated or reserved by or under the authority of any Act of Congress, or [were] wanting or fractional in quantity, or where settlement thereon with a view to preemption or homestead, or improvement thereof with a view to desert-land entry has been made heretofore or hereafter, and before the survey thereof in the field.

*Id.* Again, the language of the Enabling Act did not sufficiently withdraw or reserve lands to create implied federal reserved water rights; rather, it simply conveyed lands out of federal ownership to the State of New Mexico. Similar to the Ferguson Act, by providing for indemnity lands that were meant to replace lands in the original grant that were, in fact, disposed of or reserved for a federal purpose, the Enabling Act displays Congress's cognizance of the difference between a reservation and a grant. Thus, like the Ferguson Act, we cannot read the Enabling Act to have sufficiently withdrawn and reserved the school trust lands to reach a conclusion that it created a federal reservation in which federal reserved

water rights can be inferred.

**{24}**    In summary, none of the congressional acts upon which the Commissioner relies either adequately withdrew the school trust lands from the public domain or reserved them for a particular public purpose. *See S. Utah Wilderness Alliance*, 425 F.3d at 784. Accordingly, the Commissioner has failed to prove the threshold requirements of demonstrating the existence of implied federal reserved water rights.

**D.    Federal Purpose**

**{25}**    Even if we were to conclude that the congressional acts upon which the Commissioner relies adequately withdrew and reserved the state trust lands at issue in this case, our result would be the same. To establish that an implied federal water right exists in a certain tract of land, one must, in addition to proving that the land was withdrawn and reserved, show that the reservation was for a federal purpose. *See Cappaert*, 426 U.S. at 138. Although we do not deny that the support of common schools is a matter of national interest, we cannot conclude that it is also a federal purpose in the context of the implied federal water rights doctrine. As the term "federal purpose" has been construed in non-Indian federal reserved water rights cases, continuing federal ownership of the reserved lands appears to be a prerequisite to a determination that such rights exist. *See, e.g.*, *New Mexico*, 438 U.S. at 707 & n.14; *Cappaert*, 426 U.S. at 140-42; *Arizona*, 373 U.S. at 601.

**{26}**    The Commissioner argues that the oversight powers retained by the federal government to ensure that the trust is administered properly, along with the federal government's authority to enforce the trust's terms, represent the equivalent of federal ownership for purposes of establishing implied reserved water rights. Although we agree with the Commissioner that the Enabling Act imposes strict trust obligations on the State, *see* § 10, 36 Stat. at 564-65, we do not agree that such obligations constitute a federal purpose in conjunction with the school trust lands. We reiterate that the federal reserved water rights doctrine must be construed narrowly, and we are aware of no authority that supports the proposition that by retaining oversight or enforcement power over a state's disposition of its trust lands, the federal government also retains the title to the land that is necessary to create a federal reservation and impliedly reserve water rights.

**{27}**    We note that there is one context in which federal reserved water rights are not dependent on continuing federal ownership, namely, Indian reservation lands allotted and conveyed in fee to individual tribal members. *See, e.g.*, *United States v. Powers*, 305 U.S. 527, 532 (1939) ("[W]hen allotments of land were duly made for exclusive use and thereafter conveyed in fee [from the United States government to tribal members], the right to use some portion of tribal waters essential for cultivation passed to the owners."). The Commissioner relies on *Powers* in asserting that federal reserved water rights passed along with the school trust lands when they were conveyed to New Mexico. However, in *Powers*, it was clear and uncontested that the federal government, by treaty, withdrew the land at issue from the public domain and reserved it for a federal purpose *before* it was allotted and

14

conveyed to individual tribal members. *See id.* at 528, 532-33. Because the federal purpose under which that land was reserved required water to support the tribe's "exclusive right of cultivation," *id.* at 533, the Court concluded that the treaty creating the reservation also impliedly reserved water rights to adequately irrigate the land and refused to rule that those rights were extinguished simply because the land was conveyed in fee to individual landowners. *See id.* On the contrary, as explained above, the lands conveyed to New Mexico in the Organic Act, the Ferguson Act, and the Enabling Act were never withdrawn from the public domain and reserved for a federal purpose. As such, it necessarily follows that any attendant federal reserved water rights that the Commissioner now claims in connection with those lands were also not impliedly reserved. Accordingly, the result reached in *Powers* cannot be reached in this case.

## E. Congressional Intent

{28} In addition to arguing that Congress withdrew and reserved the school trust lands for a federal purpose, the Commissioner also contends that the circumstances surrounding Congress's grant of those lands indicates its intent to also grant water rights. Specifically, the Commissioner argues that because Congress was aware of the arid nature of New Mexico's lands when it granted the school trust lands, it must have impliedly intended to reserve water rights in order to make the lands more valuable. In response, the United States argues in its answer brief that other express acts of Congress aimed at compensating for the aridity of New Mexico's trust lands indicate that no such implied intent existed in the congressional acts upon which the Commissioner relies.

{29} The United States argues that Congress demonstrated its consciousness of the aridity of New Mexico's lands and took action to compensate for it in at least two distinct ways, neither of which involved granting water rights along with the school trust lands. First, the United States Supreme Court has recognized that Congress, in granting school trust lands to New Mexico, made the express decision to grant four sections per township, "instead of the one section per township ordinarily given in the earlier grants," in order to compensate for the fact that the value of the lands that it was granting was comparatively little as a result of the lack of water. *Lassen v. Ariz. ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 463 n.7 (1967). Second, as our Supreme Court recognized in *State ex rel. Interstate Stream Commission v. Reynolds*, 71 N.M. 389, 391, 378 P.2d 622, 623 (1963), the Ferguson Act granted the Territory of New Mexico 500,000 acres of land for the express purpose of establishing permanent water reservoirs for irrigation. Section 6, 30 Stat. at 485. However, we note that Congress did not expressly reference the need for irrigation of the school trust lands in its grant of those lands in the Ferguson Act. *See id.* § 1, 30 Stat. at 484.

{30} We agree with the United States that both actions of Congress referenced above demonstrate an acknowledgment of the aridity of the school trust lands and that both can be considered measures that were implemented to compensate for the relatively low value of those lands as a result of their aridity. Accordingly, we cannot agree with the Commissioner that we must infer a congressional intent to grant water rights along with the school trust

15

lands in order to guarantee that the arid lands that were granted remained as "productive" as possible.

**CONCLUSION**

**{31}** The Commissioner has not established that the various congressional acts promising or conveying trust lands for the support of New Mexican schools withdrew those lands from the public domain and reserved them for a federal purpose—the necessary prerequisites to a finding of congressional implied intent to reserve water rights. Therefore, we affirm the district court's grant of summary judgment.

**{32}   IT IS SO ORDERED.**

**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

**LYNN PICKARD, Judge**

**CELIA FOY CASTILLO, Judge**

**Topic Index for** *State of N.M. ex rel State Engineer v. Commissioner of Public Lands*, **No. 27,654**

**GV**        **Government**
GV-PL        Public Lands
GV-SE        State Engineer

**NR**        **Natural Resources**
NR-WL        Natural Resources - Water Law